## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No.: 1:22-cv-21123-XXXX

RUBEN GUZMAN,
YONDER SANCHEZ, and
EMMANUEL DUCHATELLIER,

       Plaintiffs,

vs.

CRUISE YACHT OP CO. LTD.,
*INDIVIDUALLY AND D/B/A*
THE RITZ-CARLTON YACHT COLLECTION,
RICHARD CARSON and CYNTHEA BERMUDEZ,

       Defendants.

**JURY TRIAL DEMANDED**

_____/

### COMPLAINT

Plaintiffs, Ruben Guzman, Yonder Sanchez, and Emmanuel Duchatellier, (collectively, "Plaintiffs"), by their undersigned counsel, Derek Smith Law Group, PLLC, hereby complain of Defendant Cruise Yacht Op Co. Ltd., *Individually and d/b/a* The Ritz-Carlton Yacht Collection ("RCYC" or the "Company"), and individual defendants, Richard Carson and Cynthea Bermudez, collectively, "Defendants," and allege as follows:

### INTRODUCTION

1.      Plaintiffs bring this action to recover damages against Defendants, for violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("**Title VII**"), 42 U.S.C. § 1981 (**"§ 1981"**), the Florida Civil Rights Act of 1992, §760.01, *et seq.*, Florida Statutes ("**FCRA**"), and with respect to Plaintiff Ruben Guzman, the Age Discrimination in Employment Act, 29 U.S.C. § 623 ("**ADEA**").

1

## JURISDICTION AND VENUE

2.      The Court has jurisdiction over this action under 28 U.S.C. § § 1331 (federal questions) and 1343(a)(3) (civil rights), 42 U.S.C. § 2000e-5(f)(3) (Title VII), and §1367 (supplemental jurisdiction), Age Discrimination in Employment Act of 1967, as codified, 29 U.S.C. §§ 621 to 634.

3.      Venue is proper in the Southern District of Florida under 42 U.S.C. § 20003-5(f)(3) and 28 U.S.C. § 1391(b) because a substantial portion of the acts or omissions giving rise to this action occurred within the Southern District of Florida, and because Defendant Ritz-Carlton Yacht Collection is domiciled in the Southern District of Florida.

## PARTIES

4.      Plaintiff, Ruben Guzman ("Guzman"), is an individual residing in Osceola County, Florida, and a former employee of RCYC.

5.      Plaintiff Yonder Sanchez ("Sanchez") is an individual residing in Miami-Dade, Florida, and a former employee of RCYC.

6.      Plaintiff Emmanuel Duchatellier ("Duchatellier") is an individual residing in Miami-Dade County, Florida, and a former employee of RCYC.

7.      Plaintiffs are properly joined under FRCP Rule 20(a)(1) because Plaintiffs, as former employees of Defendant RCYC, under the supervision of individual defendants Carson and Bermudez, assert rights to relief jointly, severally, and/or in the alternative with respect to claims arising out of the same series of occurrences, and there are legal and factual questions that are common to all Plaintiffs regarding their claims under Title VII, § 1981, and the FCRA. Plaintiff Guzman's ADEA claims are activated by the same facts that give rise to Plaintiffs' collective claims and are therefore properly joined.

2

8.      Defendant Cruise Yacht Op Co. Ltd., *Individually and d/b/a* The Ritz-Carlton Yacht Collection is a foreign profit corporation, registered to do business in Florida, with its principal place of business located at 1761 North Young Circle, Suite 3-345 Hollywood, Florida, and an office located at 2601 South Bayshore Drive, Suite 900, Miami, Florida 33133.  RCYC also maintains an office in Malta.

9.      Defendant RCYC is an "employer" within the meaning of FCRA section 760.02(7) and Title VII section 2000e(b).

10.     Defendant Richard Carson is an individual, believed to be residing in Malta.

11.     Defendant Carson is subject to personal jurisdiction in the Southern District of Florida because Carson communicated employment decisions into Florida that resulted in Plaintiffs' injuries arising under 42 U.S.C. § 1981, as alleged herein, for which Carson is subject to individual liability.

12.     Defendant Cynthea Bermudez is an individual believed to be residing in Miami-Dade County, Florida, and is subject to individual liability under 42 U.S.C. § 1981.

## ADMINISTRATIVE PREREQUISITES

13.     Plaintiffs have complied with all administrative requirements.

14.     On or about January 13, 2021, Plaintiff Guzman timely dual-filed a charge of discrimination 510-2021-05131 with the EEOC and FCHR, naming Cruise Yacht Op Co. Ltd., *Individually and d/b/a* The Ritz-Carlton Yacht Collection as the Respondent.  On or about, June 29, 2021, Guzman filed an amended charge of discrimination naming the same Respondent.  On or about, March 30, 2022, the EEOC issued his right to sue notice.  Guzman timely commenced this action within 90 days of receiving his right to sue notice.

15.     On or about June 29, 2021, Plaintiff Sanchez timely dual-filed a charge of discrimination 510-2021-05167 with the EEOC and FCHR, naming Cruise Yacht Op Co. Ltd., *Individually and d/b/a* The Ritz-Carlton Yacht Collection as the Respondent.  On or about, February 17, 2022, EEOC issued Sanchez his right to sue notice.  Sanchez timely commenced this action within 90 days of receiving his right to sue notice.

16.     On or about June 29, 2021, Plaintiff Duchatellier timely dual-filed a charge of discrimination 510-2022-00955 with the U.S. Equal Employment Opportunity Commission ("EEOC"), and the Florida Commission on Human Relations ("FCHR"), naming Cruise Yacht Op Co. Ltd., *Individually and d/b/a* The Ritz-Carlton Yacht Collection as the Respondent.  On or about, Duchatellier dual-filed an amended charge of discrimination naming the same Respondent. On or about, March 16, 2022, the EEOC issued Duchatellier his right to sue notice, and Duchatellier timely commenced this action within 90 days of receiving same.

## FACTUAL ALLEGATIONS COMMON TO ALL PLAINTIFFS

17.     Defendant RCYC employed Plaintiffs in the Reservations Office at its location in Coconut Grove (the "Miami Team").  Duchatellier, Sanchez, and Guzman were three of about a dozen sales agents, or "Yacht Vacation Consultants" ("VYCs"). The Miami Team was a diverse group of experienced sales agents, hand-selected by RCYC as top-performers in the cruise industry.  RCYC promised Plaintiffs the rare opportunity to launch the prime of their careers at a startup luxury cruise line backed by the Ritz-Carlton brand.

18.     Duchatellier is a 40-year-old black man of Haitian national origin.  Duchatellier began working for the Company in or around June of 2019.  Duchatellier came to RCYC with over a decade of experience as a personal vacation planner for a major cruise line.

19.     Sanchez is a 33-year-old Cuban man.  Sanchez is a single father.  Sanchez began working for the Company on or about November 11, 2019.  Sanchez was a seasoned cruise agent, with years of experience, previously employed by Silver Seas Cruises, a luxury line.  Sanchez left a lucrative position at Silversea Cruises to join RCYC.

20.     Guzman is a 63-year-old Hispanic, man of Mexican national origin.  RCYC was aware Guzman was a top performer at Regent Seven Seas Cruises/Oceania Cruises. Guzman applied to work for RCYC on or about March 3, 2020 and was hired shortly thereafter after successfully completing an assessment test.

21.     Mr. David Fredericks ("Fredericks"), RCYC's-then "Director of Sales," recruited Guzman from Crystal Cruises.  Guzman reported to Mr. Carlos Insuasti ("Insuasti"), RCYC's-then "Quality Assurance, Training & Sales Support Leader."

22.     Duchatellier and Sanchez reported to Frances Milian ("Milian"). Insuasti and Milian reported to Fredericks, when he was Director of Sales.

**RCYC's Struggles and the Foundation of a Workplace Replete with Discriminatory Intent**

23.     In 2017, RCYC announced it would build three superyachts to break into the ultra-luxury cruise business.  Currently, the RCYC has a 10-deck, 298-passenger superyacht in production called *Evrima*.  However, the production process has forced the Company to delay *Evrima*'s maidan voyage at least five times. Indeed, for restless guests, the allure of being among the first to travel aboard the yacht only went so far.  Consequently, angry guests demanded refunds after their cruises were cancelled or setback second and third times.

24.     The guidance from RCYC was simple: keep booking reservations.  Consequently, Plaintiffs worked under the everyday pressure of selling reservations for trips they knew would never sail.  Plaintiffs began spending half of their days handling customer service matters, cooling

down furious guests who have spent tens of thousands of dollars.  All of this gave way for the Company to reveal the worst of itself, subjecting Plaintiffs and their co-workers to the most hostile work environment they have ever experienced.

25.      While Sanchez was stationed in the outbound side of RCYC's Miami Reservations—along with Guzman and Duchatellier—RCYC commanded Sanchez to work on inbound calls.  After repeatedly requesting a shift change RCYC offered to move Sanchez to the Australian market, but still at 3 PM to 12 AM.  Fredericks told Sanchez how lucrative that would be for Sanchez given RCYC's purported high market needs there.

**Guzman is Recruited, Hired, and Subjected to Age Discrimination**

26.      On or about April 6, 2020, Guzman attended a welcome luncheon at RCYC. However, shortly thereafter, Guzman RCYC told Guzman his offer of employment would be frozen until further notice.

27.      On or about September 14, 2020, Guzman began working for RCYC along in a new hired class of YVCs, including Erica Weinstein ("Weinstein"), Merrick Sequeira ("Sequeira"), and Megan Morris ("Morris").  Weinstein, Sequeira, and Morris were about 25-30 years old.

28.      Guzman was the most experienced of the group, having worked for the luxury cruise lines RCYC sought to establish itself amongst.  Most recently, Guzman was a top-5 salesperson at Crystal Cruises. Guzman's impact at RCYC was immediate.  Indeed, during his training Guzman made 4 bookings, while the other new hires made zero.

29.      Immediately upon starting Guzman was subjected to age discrimination.  Shortly after September 14, 2020, Anthony Ova ("Ova"), a YVC, wrote, "We're having problems with a new *older employee*" in RCYC's internal messaging system. Upon information and belief, that "older employee," was Guzman, as the other new hires were substantially younger.

30.     Later that day, an employee named Luis (last name unknown), asked Guzman, "How old are you?" in front of others.  Guzman said, "I'm sixty-two."   Guzman's coworkers laughed and said, "We thought you were way younger!"  Guzman was offended that they would even ask him such a thing.

31.     Guzman had neglected to reveal his age to his peers at the beginning of his employment period because he was aware that Fredericks believed Guzman was too old.  As alleged below, Fredericks told Guzman RCYC terminated him because he was "too old."

**RCYC's Campaign to Whitewash the Plaintiffs' Immutable, Linguistic Characteristics**

32.     Meanwhile, by August of 2020, RCYC constantly instructed the YVCs to change their accents to be more "refined" and "luxurious," and "British" sounding.

33.     In or around the Summer of 2020, RCYC hired Mr. Richard Carson as its "Director of Global Sales," to head the Malta location, and replace Fredericks as the "Director of Sales." Carson held direct supervisory authority over Plaintiffs and all employees on the Miami Team.

34.     On or about August 3, 2020, Prothero called Duchatellier to see if he had "an issue" with the promotion of Carson to Director of Global Sales.

35.     On or about September 9, 2020, Prothero and Carson held a meeting with the Miami Team.  RCYC announced it was relocating its management offices to Malta.  RCYC promoted three white, European agents even though these individuals had no cruise reservations or sales backgrounds and certainly did not have the bookings to justify their promotion.

36.     Several days later, in or around mid-September of 2020, Carson had a meeting with the Miami Team.  Carson explained RCYC was unhappy with how the YVCs sounded on the calls. During daily meetings, RCYC implored the Miami Team to sound more RCYC commanded the

7

Miami Team to sound *more* "British," and conform to "European" sensibilities, sounding "refined," "upscale," and "ritzy."

37.    Specifically, RCYC repeatedly told Sanchez and Duchatellier they sounded "ghetto" on the calls. Sanchez and Duchatellier were took extreme offense to the suggestion that they were "ghetto," or spoke that way because same was an immutable characteristic. Indeed, Sanchez and Duchatellier, like others Miami YVCs, spoke with a "Miami English" that was not "ghetto," but was about their cultural, ethnic, and immutable characteristics.[1]

### Plaintiffs Express their Opposition to the New Discriminatory Script

38.    RCYC announced the "New Global Excellence Outbound Script 2020."

39.    As an industry practice, Milian had provided the Miami Team with a script for speaking to its potential clients. The original script was tailored for a diverse Miami Team, allowing each agent to rely on their personality, and disadvantaged no employee for being who they are—racially, ethically, or their national origin.

40.    While RCYC claims Plaintiffs had a choice between the new and old scripts, additional directives from RCYC executives showed the point was that the YVCs needed to change their linguistic characteristics. For instance, RCYC emailed Plaintiffs a tape of Glenn Stacy, a European agent who spoke with an accent and dialect RCYC commanded Plaintiffs to emulate.

41.    In or around mid-September of 2020, Sanchez approached Carson about his difficulties with RCY's linguistic demands. Sanchez explained that as a Hispanic individual he could not sound "British." Likewise, Sanchez explained that his Cuban/Hispanic background was integral to acquiring new bookings in a market where he was selling to Hispanic customers from

---

[1] *See* https://news.fiu.edu/2020/miami-english-yes,-its-real (Sociolinguist, Phillip Carter, noting "This is not just a linguistics issue; this is a people issue. Because your language is a part of *who* you are. Miami English belongs to *this* place and the people who live *here*. It reflects their histories and identities.") (emphasis original).

South Florida and Latin America.  Carson refused to acknowledge his plight and told Sanchez meeting RCYC's demands--with a British accent—was merely a "*new obstacle* in life."

42.     Likewise, Sanchez asked Carson if he could distribute RCYC pamphlets in Spanish because his customers were requesting same.  However, Carson refused.

43.     Milian approached Ms. Angela Composto ("Composto"), RCYC's "Sr. VP of Sales and Marketing," and explained Plaintiffs and the Miami Team were offended by RCYC's directive for the YVCs to change their immutable characteristics.  On or about September 18, 2020, Composto held a video conference with the Miami Team to discuss their objections to RCYC's discriminatory employment practices (the "Composto meeting").

44.     Duchatellier opposed the directive to "sound British" a practice he reasonably and in good faith believed was discriminatory.  Duchatellier said, "I feel we're not luxury because we don't have the British language … and we are being targeted as if we are not the luxury product [RCYC] is looking for."

45.     Sanchez also opposed the directive to "sound British," and RCYC's opposition to making selling more conducive to its Hispanic customers.  Sanchez said, "I'm missing a lot of opportunities myself because I can't send emails in Spanish … I've had a lot of Mexico leads, Argentina leads, a lot of leads in Ecuador and they want something in Spanish, but the Company has a strict rule of English only.  I've asked, and the Company says no.  And I lose a lot of connections that way."

46.     Likewise, Plaintiff's co-workers also opposed RCYC's directive to "sound British."  For example, Bianca Douglas ("Douglas"), Plaintiffs' co-YVC, said, "I will never sound British over the phone.  I will do my very best to pronounce my words.  I will say '*with* you,' not '*wit* you.'  I will do my best to talk properly. But I'll tell you this: I'm a salesperson and I'll get a

sale … that's what I know how to do.  Similarly, Pablo Martinez ("Martinez"), Plaintiff's co-sales agent, complained that Carson and the Malta office are not considering the Miami Team's diversity.  He said, "[Carson] doesn't understand *our language* … we need somebody *here in Miami* that's a leader that *understands our language*."

47.     Guzman was still in training and did not attend the Composto meeting.  However, Guzman opposed RCYC's directives for the agents to change their immutable characteristics, and to adhere to policies that were impossible for them to perform because of their race.  On or about October 20, 2020, Guzman attended a meeting with the Miami Team held by Carson regarding RCYC's Global Excellence policies. Douglas was complaining of the same issues she had articulated during the Composto meeting.  This time however, Douglas grew frustrated—a month later, with no investigation, and incessant directives that YVCs were to do what they were told and not voice concerns.  Guzman spoke out in support of Douglas.  He explained that his prior experience working for luxury cruise lines, (including Crystal Cruises, RCYC's then biggest competitor) did not dictate how sales agents were to sound on the phone.  Guzman explained the obsession over demanding YVCs to sound British over the phone was not necessary to excelling, and instead was inhibiting and discriminatory.  Guzman complained that he could not sound like the Malta agents.

48.     After the meeting, Insuasti approached Guzman and warned him that Kim Berman ("Berman"), the Human Resources director said, "Kim will reprimand you if you ever speak out again."   Berman in fact reprimanded Guzman shortly thereafter.

49.     On or about October 27, 2020, Carson implored Plaintiffs to "be smarter with [their] time," and "Strive for excellence," and that the YVCs no longer allowed to express their concerns during team meetings.

**Defendants Terminate Guzman and Duchatellier in Retaliation for Opposing RCYC's**
**Discriminatory Employment Policies**

50.    On or about November 12, 2020, RCYC terminated Duchatellier and Guzman because they opposed employment practices which they reasonably and in good faith believed violated employment discrimination laws.

51.    Alternatively, RCYC terminated Guzman's employment because of his age.

52.    Bermudez and Carson called Guzman and terminated his employment.  Bermudez told Guzman he was terminated due to budgetary layoffs because of COVID-19.   However, Guzman was the top performing newly hired YVC in the Miami reservation office, having booked about 26 reservations, generating around $ 422,947 in sales revenue at the time of his termination.

53.     On the call Guzman opposed his termination, and told Bermudez, he believed his termination was discrimination.  Bermudez screamed at Guzman and said, "How dare you say this is discriminatory.  How is this discrimination?"

54.    Later that evening, however, Fredericks called Guzman and told him RCYC terminated Guzman because "You were *too old* and they *didn't want you* on the team."

55.    Indeed, RCYC did not terminate Weinstein, Megan, and Merrick, who were substantially younger that Guzman, and who likewise underperformed Guzman.

56.    RCYC destroyed Guzman's career. RCYC had lured Guzman from his career at Crystal Cruises where he was a top performer.  Guzman was employed by RCYC from September 14, 2020 to November 12, 2020.  Guzman was a top performer, and had generated the most revenue out of all the YVCs in his new hire class.

57.    Shortly after his termination, Guzman was diagnosed with insomnia, anxiety and depression.

58.     On or about November 12, 2020, RCYC terminated Duchatellier's employment in retaliation for opposing RCYC's employment practices which he reasonably and in good faith believed violated discrimination laws.  Bermudez and Carson called Duchatellier to terminate his employment, both equipped with actual knowledge that Duchatellier spoke out during the Composto meeting.  Duchatellier had about $75,000 in booking revenue during October of 2020.  During his employment, Duchatellier generated about $3 million in sales revenue.

**RCYC Retaliates Against Sanchez After and Because He Opposed RCYC's Directives to "Sound British," And After and Because Filed An EEOC Charge Of Discrimination**

59.     RCYC initiated a series of retaliatory actions against Sanchez immediately after he opposed RCYC's "Global excellence" policies.

60.     Meanwhile, in or around late September of 2020, days after the Composto meeting, Sanchez requested a shift change from Carson to work the day shift.  Carson denied Sanchez's requests, yet allowed a new hire, like Weinstein, who also worked the night shift, to work the day shift in addition to same.

61.     RCYC did not terminate Plaintiff Sanchez's employment on November 12, 2020, but instead made his employment a living hell.

62.     After RCYC terminated Milian, RCYC began targeting Sanchez, taking every opportunity to make him quit, without the protection of Milian and her voice to executives.

63.     Indeed, Sanchez's anxiety and depression became more severe by the day.  He underwent extreme and rapid weight loss, and he could not sleep.  This point is buttressed by the fact that Sanchez was working remotely from home.

64.     On or about November 12, 2020, Fredericks called Sanchez and told him, "You're lucky we didn't let you go."

65.    In or around November of 2020, Sanchez requested to alter his schedule set at 3 PM to 12 AM.  Sanchez requested a change to a daytime shift because he wanted to: (1) move from inbound to outbound to increase his earning potential, (2) care for his daughter as a single father, and (3) because the night shift was taking an extreme toll on his mental health.  Around this time, RCYC moved an outbound agent to work the same shift as Sanchez.  However, RCYC allowed that agent to work both inbound and outbound work, but allowed Sanchez only to perform inbound work.

66.    Throughout the Spring of 2021, RCYC initiated a series of faulty, unsubstantiated written and verbal reprimands to Sanchez because he opposed its practices

67.    On or about April 1, 2021, at around 6:30 PM, Bermudez emailed Sanchez, providing a written warning.  The reprimand was based on an unsubstantiated allegation engineered by RCYC to write Sanchez up for a false activity.  Around this time, Sanchez feared RCYC was scheming to terminate him.

68.    On or about May 17, 2021, Weinstein and Bermudez provided Sanchez a subsequent written warning for an event that never happened.

69.    On or about June 26, 2021, Sanchez filed an EEOC charge alleging RCYC discriminated against him because of his race, and retaliated against him for complaining of same.

70.    On or about July 8, 2021, Erica Weinstein reprimanded Sanchez for an unsubstantiated event because Sanchez filed an EEOC charge.

71.    Shortly thereafter, Sanchez resigned his employment because he reasonably believed RCYC was seeking to terminate him based on its incessant campaign to reprimand him in retaliation for opposing its employment practices—which he reasonably and in good faith believed were discriminatory—and because he filed an EEOC charge against the Company.

**Defendants Have Permanently Damaged Plaintiffs**

72. Defendants unlawfully discriminated against Plaintiffs because of their race, and because they complained and opposed discrimination and retaliation predicated on their race.

73. As a result of Defendants' unlawful conduct, in violation of Title VII, § 1981, the ADEA, and the FCRA, respectively, Plaintiffs have suffered damages, including but not limited to financial and economic damages, lost wages (back pay and front pay) and benefits, advancement opportunities with Defendant, and continues to suffer the same.

74. Plaintiffs have also suffered—and have records of suffering—emotional distress, mental anguish, loss of personal dignity, and other intangible damages.

75. Plaintiffs claim aggravation, activation, and/or exacerbation of any preexisting conditions.

76. Plaintiffs also seek punitive damages against Defendants because of their implantation of blatant discriminatory practices with malice or with reckless indifference to Plaintiffs' civil rights under federal and state law.

77. At bottom, Defendants are liable for depriving Plaintiffs of their right to pursue an equal employment opportunity in a work environment free from relentless discrimination, harassment and retaliation predicated on their immutable characteristics.

**CAUSES OF ACTION**

**COUNT I**
**Title VII, 42 U.S.C. § 2000e-3(a)**
**Retaliation**
**(Plaintiffs against Defendant RCYC)**

78. Plaintiffs reincorporate the allegations in paragraphs 33-72.

79. Defendant RCYC violated Title VII's anti-retaliation provision by taking materially adverse actions against Plaintiffs because Plaintiffs engaged in protected activity.  To

14

be sure, as alleged herein, and stated below, RCYC would not have taken materially adverse actions against Plaintiffs but-for their respective protected activity.

80.     Plaintiffs engaged in protected activity by opposing RCYC's employment practices, including RCYC's directives to "sound British," instead of "ghetto."

81.     On or about September 18, 2020, during the Composto meeting, Sanchez and Duchatellier opposed what they reasonably and in good faith believed were discriminatory employment practices in violation of Title VII.

82.     Plaintiff Duchatellier engaged in protected activity by opposing the Company's employment practices which he reasonably believed and in good faith believed were discriminatory.  During the Composto meeting, Plaintiff Duchatellier said, "I feel we're not luxury because we don't have the British language … and we are being targeted as if we are not the luxury product [RCYC] is looking for."

83.     Plaintiff Sanchez engaged in protected activity by opposing the Company's employment practices which he reasonably believed and in good faith believed were discriminatory.  First, in or around mid-September of 2020, Sanchez complained directly to Carson that he could not change his language to conform with what RCYC was looking for.  Second, Sanchez opposed the same discriminatory practices on or about September 18, 2020 during the Composto meeting.  Sanchez explained, "I'm missing a lot of opportunities myself because I can't send emails in Spanish … I've had a lot of Mexico leads, Argentina leads, a lot of leads in Ecuador and they want something in Spanish, but the Company has a strict rule of English only.  I've asked, and the Company says no.  And I lose a lot of connections that way."  Sanchez also engaged in protected activity by filing an EEOC charge on or about June 26, 2021, and by participating in the investigation of same.

84.     Plaintiff Guzman engaged in protected activity by opposing the Company's employment practices which he reasonably believed and in good faith believed were discriminatory.  On or about October 20, 2020, Guzman opposed Carson's directives regarding RCYC's demands for YVCs to sound British on their phone calls.  Guzman supported Douglas and explained that changing their immutable characteristics was impossible. Likewise, Guzman complained their dialect had no correlation to their sales because the Miami office outperformed the Malta office.

85.     Plaintiffs engaged in protected activity again, collectively, during a meeting in or around October of 2020, in opposition to the impossible task to sound like Glen Stacy, a European agent RCYC commanded Plaintiffs to emulate.

86.     Plaintiffs each suffered materially adverse actions after and because they engaged in protected activity described above, which they would not have suffered but for engaging in protected activity.

87.     Collectively, RCYC discriminated against Plaintiffs when Carson, an RCYC executive, reprimanded Plaintiffs about October 27, 2020 commanding Plaintiffs to "be smarter with [their] time," and to "Strive for excellence," rather than leverage discrimination complaints.

88.     Plaintiff Duchatellier suffered materially adverse actions as a direct result of the above-described protected activity.  On or about November 12, 2020, Defendants terminated Duchatellier's employment because he opposed employment practices he reasonably and in good faith believed were unlawful.  Any reasonable employee in Duchatellier' s position might well have been dissuaded from opposing and/or supporting a charge of discrimination if the worker knew his employer would terminate his employment because of same.

89.     Plaintiff Guzman suffered materially adverse actions after and because he engaged in the protected activity alleged herein.  On or about November 12, 2020, Defendants terminated Duchatellier's employment because he opposed employment practices he reasonably and in good faith believed were unlawful.  Any reasonable employee in Guzman's position might well have been dissuaded from opposing and/or supporting a charge of discrimination if the worker knew his employer would terminate his employment a consequence of same.

90.     Plaintiff Sanchez suffered materially adverse actions after and because of the protected activity described above.  RCYC initiated a series of retaliatory events on the heels of his protected activity.  In or around early September of 2020, after Sanchez complained to Carson that he could not sound different on the calls because of his race, Carson told Sanchez adhering to RCYC's policies—to conceivable alter his immutable characteristics—was merely a "a new obstacle in life."  As a result of same, Sanchez suffered extreme weight loss, anxiety and depression—which has persisted, in 2022. In or around late September of 2020, days after the Composto meeting, Carson denied Sanchez's requests to work the day shifts when Sanchez said he could earn more money.

91.     Throughout the Spring of 2021 RCYC initiated a series of faulty, unsubstantiated reprimands against Sanchez which he proved were untrue.  Days after Sanchez filed an EEOC charge, on or about July 8, 2021, Bermudez and Weinstein reprimanded Sanchez for an unsubstantiated reason.  Any reasonable employee in Sanchez's position might well have been dissuaded from opposing and/or supporting a charge of discrimination if the worker knew his employer would take the actions described above.

92.     Plaintiffs' adverse actions and protected activity are causally connected based on temporal proximity, or because RCYC otherwise initiated a series of retaliatory actions on the

17

heels of their respective protected activity.   RCYC decisionmakers, including Carson and Bermudez were aware of Plaintiffs' protected activity when they initiated the above-described adverse actions.

93.    Plaintiff Duchatellier' s materially adverse actions are causally connected to his protected activity. Carson, Bermudez, and Prothero were aware of Duchatellier's discrimination complaints in or around late September of 2020 when they terminated his employment on or about November 12, 2020. These facts give rise to the plausible inference that Duchatellier' s protected activity and the subsequent materially adverse actions are causally connected.

94.    Plaintiff Guzman's materially adverse actions are causally connected to his protected activity. Carson, Bermudez, and Prothero were aware of Plaintiff Guzman's discrimination complaints in or around late October of 2020 when they terminated his employment on or about November 12, 2020. These facts give rise to the plausible inference that Guzman's materially adverse actions are causally connected to his protected activity.

95.    Plaintiff Sanchez's materially adverse actions are causally connected to his protected activity because decisionmakers were aware of same when they initiated a series of adverse action on the heels of Sanchez's opposition to what he reasonably and in good faith believed were discriminatory practices.  Indeed, when Sanchez opposed the "Global Excellence" policies to Carson, Carson immediately said it was "a new obstacle in life."  Then, after the Composto meeting, Carson denied Sanchez's shift change accommodations, yet allowed Weinstein to work the day shift and the night shift.  Weinstein, Carson, and Bermudez were aware of Sanchez's protected activity when they continued the series of retaliatory actions throughout the Winter, Spring and Summer of 2021.  Indeed, a week after Sanchez filed his EEOC charge, Bermudez reprimanded Sanchez for an unsubstantiated claim.  These facts give rise to the plausible

inference that Sanchez's materially adverse actions—initiated on the heels of his protected activity—are causally connected to his discrimination complaints.

96.     Taken together, these allegations give rise to the plausible inference that Plaintiffs were discriminated against for opposing and/or participating in activity that they reasonably believed violated Title VII.

97.     As a result of Defendant RCYC's unlawful retaliation in violation of Title VII § 200e-3(a), Plaintiffs have suffered damages.

**COUNT II**
**FCRA § 760.10(7)**
**Retaliation**
**(Plaintiffs against Defendant RCYC)**

98.     Plaintiffs reincorporate the allegations in paragraphs 33-72.

99.     Defendant RCYC violated the FCRA's anti-retaliation provision by taking materially adverse actions against Plaintiffs because Plaintiffs engaged in protected activity.

100.    Plaintiffs engaged in protected activity by opposing RCYC's employment practices, including RCYC's directives to "sound British," instead of "ghetto."

101.    On or about September 18, 2020, during the Composto meeting, Sanchez and Duchatellier opposed what they reasonably and in good faith believed were discriminatory employment practices in violation of the FCRA.

102.    Plaintiff Duchatellier engaged in protected activity by opposing the Company's employment practices which he reasonably believed and in good faith believed were discriminatory.  During the Composto meeting, Plaintiff Duchatellier said, "I feel we're not luxury because we don't have the British language … and we are being targeted as if we are not the luxury product [RCYC] is looking for."

103.     Plaintiff Sanchez engaged in protected activity by opposing the Company's employment practices which he reasonably believed and in good faith believed were discriminatory.  First, in or around mid-September of 2020, Sanchez complained directly to Carson that he could not change his language to conform with what RCYC was looking for.  Second, Sanchez opposed the same discriminatory practices on or about September 18, 2020 during the Composto meeting.  Sanchez explained, "I'm missing a lot of opportunities myself because I can't send emails in Spanish … I've had a lot of Mexico leads, Argentina leads, a lot of leads in Ecuador and they want something in Spanish, but the Company has a strict rule of English only.  I've asked, and the Company says no.  And I lose a lot of connections that way."  Sanchez also engaged in protected activity by filing an EEOC charge on or about June 26, 2021, and by participating in the investigation of same.

104.     Plaintiff Guzman engaged in protected activity by opposing the Company's employment practices which he reasonably believed and in good faith believed were discriminatory.  On or about October 20, 2020, Guzman opposed Carson's directives regarding RCYC's demands for YVCs to sound British on their phone calls.  Guzman supported Douglas and explained that changing their immutable characteristics was impossible. Likewise, Guzman complained their dialect had no correlation to their sales because the Miami office outperformed the Malta office.

105.     Plaintiffs engaged in protected activity again, collectively, during a meeting in or around October of 2020, in opposition to the impossible task to sound like Glen Stacy, a European agent RCYC commanded Plaintiffs to emulate.

106.    Plaintiffs each suffered materially adverse actions after and because they engaged in protected activity described above, which they would not have suffered but for engaging in protected activity.

107.    Collectively, RCYC discriminated against Plaintiffs when Carson, an RCYC executive, reprimanded Plaintiffs about October 27, 2020 commanding Plaintiffs to "be smarter with [their] time," and to "Strive for excellence," rather than leverage discrimination complaints.

108.    Plaintiff Duchatellier suffered materially adverse actions as a direct result of the above-described protected activity.   On or about November 12, 2020, Defendants terminated Duchatellier's employment because he opposed employment practices he reasonably and in good faith believed were unlawful.   Any reasonable employee in Duchatellier' s position might well have been dissuaded from opposing and/or supporting a charge of discrimination if the worker knew his employer would terminate his employment because of same.

109.    Plaintiff Guzman suffered materially adverse actions after and because he engaged in the protected activity alleged herein.   On or about November 12, 2020, Defendants terminated Duchatellier's employment because he opposed employment practices he reasonably and in good faith believed were unlawful.   Any reasonable employee in Guzman's position might well have been dissuaded from opposing and/or supporting a charge of discrimination if the worker knew his employer would terminate his employment a consequence of same.

110.    Plaintiff Sanchez suffered materially adverse actions after and because of the protected activity described above.   RCYC initiated a series of retaliatory events on the heels of his protected activity.   In or around early September of 2020, after Sanchez complained to Carson that he could not sound different on the calls because of his race, Carson told Sanchez adhering to RCYC's policies—to conceivable alter his immutable characteristics—was merely a "a new

obstacle in life."  As a result of same, Sanchez suffered extreme weight loss, anxiety and depression—which has persisted, in 2022. In or around late September of 2020, days after the Composto meeting, Carson denied Sanchez's requests to work the day shifts when Sanchez said he could earn more money.

111.    Throughout the Spring of 2021 RCYC initiated a series of faulty, unsubstantiated reprimands against Sanchez which he proved were untrue.  Days after Sanchez filed an EEOC charge, on or about July 8, 2021, Bermudez and Weinstein reprimanded Sanchez for an unsubstantiated reason.  Any reasonable employee in Sanchez's position might well have been dissuaded from opposing and/or supporting a charge of discrimination if the worker knew his employer would take the actions described above.

112.    Plaintiffs' adverse actions and protected activity are causally connected based on temporal proximity, or because RCYC otherwise initiated a series of retaliatory actions on the heels of their respective protected activity.  RCYC decisionmakers, including Carson and Bermudez were aware of Plaintiffs' protected activity when they initiated the above-described adverse actions.

113.    Plaintiff Duchatellier' s materially adverse actions are causally connected to his protected activity. Carson, Bermudez, and Prothero were aware of Duchatellier's discrimination complaints in or around late September of 2020 when they terminated his employment on or about November 12, 2020. These facts give rise to the plausible inference that Duchatellier' s protected activity and the subsequent materially adverse actions are causally connected.

114.    Plaintiff Guzman's materially adverse actions are causally connected to his protected activity. Carson, Bermudez, and Prothero were aware of Plaintiff Guzman's discrimination complaints in or around late October of 2020 when they terminated his employment

on or about November 12, 2020. These facts give rise to the plausible inference that Guzman's materially adverse actions are causally connected to his protected activity.

115.    Plaintiff Sanchez's materially adverse actions are causally connected to his protected activity because decisionmakers were aware of same when they initiated a series of adverse action on the heels of Sanchez's opposition to what he reasonably and in good faith believed were discriminatory practices.  Indeed, when Sanchez opposed the "Global Excellence" policies to Carson, Carson immediately said it was "a new obstacle in life."  Then, after the Composto meeting, Carson denied Sanchez's shift change accommodations, yet allowed Weinstein to work the day shift and the night shift.  Weinstein, Carson, and Bermudez were aware of Sanchez's protected activity when they continued the series of retaliatory actions throughout the Winter, Spring and Summer of 2021.  Indeed, a week after Sanchez filed his EEOC charge, Bermudez reprimanded Sanchez for an unsubstantiated claim.  These facts give rise to the plausible inference that Sanchez's materially adverse actions—initiated on the heels of his protected activity—are causally connected to his discrimination complaints.

116.    Taken together, these allegations give rise to the plausible inference that Plaintiffs were discriminated against for opposing and/or participating in activity that they reasonably believed violated the FCRA.

117.    As a result of Defendant RCYC's unlawful retaliation in violation of the FCRA, Plaintiffs have suffered damages.

### COUNT III
### 42 U.S.C. § 1981
### Retaliation
### (Plaintiffs against all Defendants)

118.    Plaintiffs reincorporate the allegations in paragraphs 41-79.

119.     Defendant RCYC, Carson, and Salazar violated § 1981 by taking materially adverse actions against Plaintiffs because Plaintiffs engaged in protected activity.

120.     On or about September 18, 2020, during the Composto meeting, Sanchez and Duchatellier opposed what they reasonably and in good faith believed were discriminatory employment practices in violation of § 1981.

121.     Plaintiff Duchatellier engaged in protected activity by opposing the Company's employment practices which he reasonably believed and in good faith believed were discriminatory.  During the Composto meeting, Plaintiff Duchatellier said, "I feel we're not luxury because we don't have the British language … and we are being targeted as if we are not the luxury product [RCYC] is looking for."

122.     Plaintiff Sanchez engaged in protected activity by opposing the Company's employment practices which he reasonably believed and in good faith believed were discriminatory.  First, in or around mid-September of 2020, Sanchez complained directly to Carson that he could not change his language to conform with what RCYC was looking for.  Second, Sanchez opposed the same discriminatory practices on or about September 18, 2020 during the Composto meeting.  Sanchez explained, "I'm missing a lot of opportunities myself because I can't send emails in Spanish … I've had a lot of Mexico leads, Argentina leads, a lot of leads in Ecuador and they want something in Spanish, but the Company has a strict rule of English only.  I've asked, and the Company says no.  And I lose a lot of connections that way."  Sanchez also engaged in protected activity by filing an EEOC charge on or about June 26, 2021, and by participating in the investigation of same.

123.     Plaintiff Guzman engaged in protected activity by opposing the Company's employment practices which he reasonably believed and in good faith believed were

24

discriminatory.  On or about October 20, 2020, Guzman opposed Carson's directives regarding RCYC's demands for YVCs to sound British on their phone calls.  Guzman supported Douglas and explained that changing their immutable characteristics was impossible. Likewise, Guzman complained their dialect had no correlation to their sales because the Miami office outperformed the Malta office.

124.    Plaintiffs engaged in protected activity again, collectively, during a meeting in or around October of 2020, in opposition to the impossible task to sound like Glen Stacy, a European agent RCYC commanded Plaintiffs to emulate.

125.    Plaintiffs each suffered materially adverse actions after and because they engaged in protected activity described above, which they would not have suffered but for engaging in protected activity.

126.    Collectively, RCYC discriminated against Plaintiffs when Carson, an RCYC executive, reprimanded Plaintiffs about October 27, 2020 commanding Plaintiffs to "be smarter with [their] time," and to "Strive for excellence," rather than leverage discrimination complaints.

127.    Plaintiff Duchatellier suffered materially adverse actions as a direct result of the above-described protected activity.  On or about November 12, 2020, Defendants terminated Duchatellier's employment because he opposed employment practices he reasonably and in good faith believed were unlawful.  Any reasonable employee in Duchatellier' s position might well have been dissuaded from opposing and/or supporting a charge of discrimination if the worker knew his employer would terminate his employment because of same.

128.    Plaintiff Guzman suffered materially adverse actions after and because he engaged in the protected activity alleged herein.  On or about November 12, 2020, Defendants terminated Duchatellier's employment because he opposed employment practices he reasonably and in good

faith believed were unlawful.  Any reasonable employee in Guzman's position might well have been dissuaded from opposing and/or supporting a charge of discrimination if the worker knew his employer would terminate his employment a consequence of same.

129.   Plaintiff Sanchez suffered materially adverse actions after and because of the protected activity described above.  RCYC initiated a series of retaliatory events on the heels of his protected activity.  In or around early September of 2020, after Sanchez complained to Carson that he could not sound different on the calls because of his race, Carson told Sanchez adhering to RCYC's policies—to conceivable alter his immutable characteristics—was merely a "a new obstacle in life."  As a result of same, Sanchez suffered extreme weight loss, anxiety and depression—which has persisted, in 2022. In or around late September of 2020, days after the Composto meeting, Carson denied Sanchez's requests to work the day shifts when Sanchez said he could earn more money.

130.   Throughout the Spring of 2021 RCYC initiated a series of faulty, unsubstantiated reprimands against Sanchez which he proved were untrue.  Days after Sanchez filed an EEOC charge, on or about July 8, 2021, Bermudez and Weinstein reprimanded Sanchez for an unsubstantiated reason.  Any reasonable employee in Sanchez's position might well have been dissuaded from opposing and/or supporting a charge of discrimination if the worker knew his employer would take the actions described above.

131.   Plaintiffs' adverse actions and protected activity are causally connected based on temporal proximity, or because RCYC otherwise initiated a series of retaliatory actions on the heels of their respective protected activity.  RCYC decisionmakers, including Carson and Bermudez were aware of Plaintiffs' protected activity when they initiated the above-described adverse actions.

132.    Plaintiff Duchatellier' s materially adverse actions are causally connected to his protected activity. Carson, Bermudez, and Prothero were aware of Duchatellier's discrimination complaints in or around late September of 2020 when they terminated his employment on or about November 12, 2020. These facts give rise to the plausible inference that Duchatellier' s protected activity and the subsequent materially adverse actions are causally connected.

133.    Plaintiff Guzman's materially adverse actions are causally connected to his protected activity. Carson, Bermudez, and Prothero were aware of Plaintiff Guzman's discrimination complaints in or around late October of 2020 when they terminated his employment on or about November 12, 2020. These facts give rise to the plausible inference that Guzman's materially adverse actions are causally connected to his protected activity.

134.    Plaintiff Sanchez's materially adverse actions are causally connected to his protected activity because decisionmakers were aware of same when they initiated a series of adverse action on the heels of Sanchez's opposition to what he reasonably and in good faith believed were discriminatory practices.  Indeed, when Sanchez opposed the "Global Excellence" policies to Carson, Carson immediately said it was "a new obstacle in life."  Then, after the Composto meeting, Carson denied Sanchez's shift change accommodations, yet allowed Weinstein to work the day shift and the night shift.  Weinstein, Carson, and Bermudez were aware of Sanchez's protected activity when they continued the series of retaliatory actions throughout the Winter, Spring and Summer of 2021.  Indeed, a week after Sanchez filed his EEOC charge, Bermudez reprimanded Sanchez for an unsubstantiated claim.  These facts give rise to the plausible inference that Sanchez's materially adverse actions—initiated on the heels of his protected activity—are causally connected to his discrimination complaints.

135.     Taken together, the above allegations gives rise to the reasonable inference that Defendants violated § 1981, and Plaintiffs are entitled to relief.

136.     Plaintiffs have suffered damages as a result of Defendants' violations of § 1981.

**COUNT IV**
**Title VII, 42 U.S.C. § 2000e-(a)**
**Retaliatory Hostile Work Environment**
**(Plaintiffs against Defendant RCYC)**

137.     Plaintiffs reincorporate the allegations in paragraphs 76-134.

138.     Alternatively, Defendant RCYC created a retaliatory hostile work environment by subjecting Plaintiffs to unwelcome harassment because they engaged in protected activity.  As shown below, Plaintiffs' protected activity was the but for cause of a series of unwelcome harassing incidents that might well dissuade a reasonable worker from complaining about discrimination.

139.     Plaintiffs Duchatellier and Sanchez engaged in protected activity by participating in the Composto meeting, to oppose what they reasonably and in good faith believed were unlawful employment practices in violation of Title VII.

140.     Plaintiff Guzman engaged in engaged in protected activity on or about October 20, 2020, during a YVC meeting where he opposed RCYC's global excellence policies.

141.     RCYC subjected Plaintiffs to unwelcome harassment when Carson told the agents to be "smarter" with their time, and stop complaining.

142.     Plaintiff Guzman suffered unwanted harassment that well might have dissuaded a reasonable person from making or supporting a charge of discrimination because after he spoke out in support of Douglas, Guzman's supervisors reprimanded him and told him never to complain in meetings again.  Likewise, Insuasti told Guzman that Berman from H.R. does not tolerate that.  RCYC terminated Guzman's employment after and because he engaged in protected activity.  Any

reasonable worker in Duchatellier' s positions well might have been dissuaded from complaining and/or opposing discrimination if he knew termination was the consequence.

143.    Plaintiff Duchatellier suffered unwanted harassment that well might have dissuaded a reasonable person from making or supporting a charge of discrimination because after he opposed discriminatory practices during the Composto meeting, RCYC terminated his employment.  Any reasonable worker in Duchatellier' s positions well might have been dissuaded from complaining and/or opposing discrimination if he knew termination was the consequence.

144.    Plaintiff Sanchez suffered harassment that well might have dissuaded a reasonable worker from making or supporting a charge of discrimination because in or around early September of 2020, Carson told Sanchez adhering to RCYC's directives to change his immutable characteristics was merely "a new obstacle in life."  Likewise, Carson denied Sanchez's shift change requests days after the Composto meeting.

145.    Throughout the Spring of 2021, RCYC initiated a series of faulty reprimands to Sanchez. On or about April 1, 2021, at around 6:30 PM, Bermudez emailed Sanchez, providing a written warning.  The reprimand was based on an unsubstantiated allegation engineered by RCYC to write Sanchez up for a false activity.  On or about May 17, 2021, Weinstein and Bermudez provided Sanchez a subsequent written warning for an event that never happened.  On or about July 8, 2021, Erica Weinstein reprimanded Sanchez for an unsubstantiated event because Sanchez filed an EEOC charge.

146.    Taken together, the above gives rise to the reasonable inference that Defendant RCYC subjected Plaintiffs to a retaliatory hostile work environment in violation of Title VII.

147.    Plaintiffs have suffered damages as a result of RCYC's violations of Title VII.

**COUNT V**
**FCRA § 760.10(7)**
**Retaliatory Hostile Work Environment**
**(Plaintiffs against Defendant RCYC)**

148.     Plaintiffs reincorporate the allegations in paragraphs 76-134.

149.     Defendant RCYC subjected Plaintiffs to a retaliatory hostile work environment by altering the terms and conditions of Plaintiffs' employment because they engaged in protected activity by opposing what they reasonably believed to be discriminatory employment practices.

150.     Plaintiffs Duchatellier and Sanchez engaged in protected activity by participating in the Composto meeting, to oppose what they reasonably and in good faith believed were unlawful employment practices in violation of the FCRA.

151.     Plaintiff Guzman engaged in engaged in protected activity on or about October 20, 2020, during a YVC meeting where he opposed RCYC's global excellence policies.

152.     RCYC subjected Plaintiffs to unwelcome harassment when Carson told the agents to be "smarter" with their time, and stop complaining.

153.     Plaintiff Guzman suffered unwanted harassment that well might have dissuaded a reasonable person from making or supporting a charge of discrimination because after he spoke out in support of Douglas, Guzman's supervisors reprimanded him and told him never to complain in meetings again.  Likewise, Insuasti told Guzman that Berman from H.R. does not tolerate that. RCYC terminated Guzman's employment after and because he engaged in protected activity.  Any reasonable worker in Duchatellier' s positions well might have been dissuaded from complaining and/or opposing discrimination if he knew termination was the consequence.

154.     Plaintiff Duchatellier suffered unwanted harassment that well might have dissuaded a reasonable person from making or supporting a charge of discrimination because after he opposed discriminatory practices during the Composto meeting, RCYC terminated his

employment.  Any reasonable worker in Duchatellier's positions well might have been dissuaded from complaining and/or opposing discrimination if he knew termination was the consequence.

155.    Plaintiff Sanchez suffered harassment that well might have dissuaded a reasonable worker from making or supporting a charge of discrimination because in or around early September of 2020, Carson told Sanchez adhering to RCYC's directives to change his immutable characteristics was merely "a new obstacle in life."  Likewise, Carson denied Sanchez's shift change requests days after the Composto meeting.

156.    Throughout the Spring of 2021, RCYC initiated a series of faulty reprimands to Sanchez. On or about April 1, 2021, at around 6:30 PM, Bermudez emailed Sanchez, providing a written warning.  The reprimand was based on an unsubstantiated allegation engineered by RCYC to write Sanchez up for a false activity.  On or about May 17, 2021, Weinstein and Bermudez provided Sanchez a subsequent written warning for an event that never happened.  On or about July 8, 2021, Erica Weinstein reprimanded Sanchez for an unsubstantiated event because Sanchez filed an EEOC charge.

157.    Taken together, the above gives rise to the reasonable inference that Defendant RCYC subjected Plaintiffs to a retaliatory hostile work environment in violation of the FCRA.

158.    Plaintiffs have suffered damages as a result of RCYC's violations of the FCRA.

<u>**COUNT VI**</u>
**ADEA, 29 U.S.C. § 623(1)**
**Disparate Treatment – Age**
<u>**(Plaintiff Guzman against Defendant RCYC)**</u>

159.    Plaintiff Guzman reincorporates the allegations in paragraphs 27-32; 52-59.

160.    Alternatively, Defendant RCYC intentionally discriminated against Plaintiff Guzman because of his age by terminating his employment on or about November 12, 2020.

161.     Plaintiff Guzman was 62 years old at the time of his termination and therefore is a protected class member under the ADEA.

162.     Plaintiff was qualified for his position because he passed RCYC's assessment test, met its objective qualifications at the time of his hiring, and was the top performing YVC at the time of his termination.

163.     Plaintiff suffered an adverse employment action because he was terminated on or about November 12, 2020 because of his age.

164.     Plaintiff Guzman's termination occurred under circumstances giving rise to a plausible inference of age discrimination.  Plaintiff Guzman's age was a determinative factor in RCYC's decision to terminate him, and he would not have been terminated but for his age. Fredericks called Guzman on or about November 12, 2020, the day he was terminated, and told Guzman RCYC terminated his employment *because he was "too old."*  This allegation, on its own, shows RCYC's intent to discriminate against Plaintiff Guzman because of his age.

165.     Additionally, RCYC did not terminate the substantially younger YVCs— Weinstein, Sequeira, and Morris—who were about 25-30 years old—even though Guzman outperformed those employees during their training, after their training, and at the time of Guzman's termination.  Guzman had booked 26 reservations, generating $ 422,947 in sales.

166.     Taken together, these allegations give rise to the plausible inference that Defendant RCYC terminated Plaintiff Guzman because of his age in violation of the ADEA.

167.     As a result of Defendant RCYC's discriminatory practices in violation of the ADEA, Plaintiff Guzman has suffered damages.

**COUNT VII**
**FCRA, § 760.10(a)**
**Disparate Treatment – Age**
**(Plaintiff Guzman against Defendant RCYC)**

168.     Plaintiff reincorporates the allegations contained in 27-32; 52-59.

169.     Alternatively, Defendant RCYC intentionally discriminated against Plaintiff Guzman because of his age by terminating his employment on or about November 12, 2020.

170.     Plaintiff Guzman was 62 years old at the time of his termination and therefore is a protected class member under the FCRA.

171.     Plaintiff was qualified for his position because he passed RCYC's assessment test, met its objective qualifications at the time of his hiring, and was the top performing YVC at the time of his termination.

172.     Plaintiff suffered an adverse employment action because he was terminated on or about November 12, 2020 because of his age.

173.     Plaintiff Guzman's termination occurred under circumstances giving rise to a plausible inference of age discrimination.  Plaintiff Guzman's age was a determinative factor in RCYC's decision to terminate him, and he would not have been terminated but for his age. Fredericks called Guzman on or about November 12, 2020, the day he was terminated, and told Guzman RCYC terminated his employment *because he was "too old."*  This allegation, on its own, shows RCYC's intent to discriminate against Plaintiff Guzman because of his age.

174.     Additionally, RCYC did not terminate the substantially younger YVCs— Weinstein, Sequeira, and Morris—who were about 25-30 years old—even though Guzman outperformed those employees during their training, after their training, and at the time of Guzman's termination.  Guzman had booked 26 reservations, generating $ 422,947 in sales.

33

175.    Taken together, these allegations give rise to the plausible inference that Defendant RCYC terminated Plaintiff Guzman because of his age in violation of the FCRA.

176.    As a result of Defendant RCYC's discriminatory practices in violation of the ADEA, Plaintiff Guzman has suffered damages.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs demand judgment against Defendants, containing the following relief, respectively:

A.    As against Defendant Ritz-Carlton Yacht Collection, pursuant to FCRA § 760.11(5), Title VII § 102(b)(3), § 1981, and as against Defendant Carson and Bermudez, pursuant to § 1981, and with respect to Plaintiff Guzman, as against Defendant Ritz-Carlton Yacht Collection, the ADEA, 29 U.S.C. § 1981, an award of damages in an amount to be determined at trial, plus prejudgment interest to compensate Plaintiffs for all monetary and/or economic damages, including, but not limited to, the loss of past and future income, wages, compensation, commissions, job security and other benefits of employment;

B.    As against Defendant Ritz-Carlton Yacht Collection, pursuant to FCRA § 760.11(5), Title VII § 102(b)(3), and § 1981, and against Defendants Carson and Bermudez, pursuant to § 1981, an award of damages in an amount to be determined at trial, plus prejudgment interest to compensate Plaintiffs for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses;

C.    As against Defendant Ritz-Carlton Yacht Collection, pursuant to FCRA §760.11(5), Title VII § 102(b)(1), 42 U.S.C. § 1981a, and as against Defendant Carson and Bermudez, under 42 U.S.C. § 1981a, an award of punitive damages for Defendants' engagement

in discriminatory practices with malice or with reckless indifference to Plaintiffs' rights under federal and state law;

D.      As against Defendant Ritz-Carlton Yacht Collection, pursuant to FCRA § 760.11(5) and Title VII § 103, 42 U.S.C. § 1988(b), and, as against Defendants Carson and Bermudez, pursuant to § 1988(b) and pursuant to, an award of costs Plaintiffs have incurred in this Action, and Plaintiffs' reasonable attorneys' fees plus interest; and

E.      Such other and further relief the Court deems just and proper.

## JURY DEMAND

Plaintiffs hereby demand a jury trial of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure and Section 102 of the Civil Rights Act of 1991.


Dated: April 13, 2022

Respectfully submitted,


*/s/ Brett D. Kaplan*
Brett D. Kaplan, Esq. (Fla. Bar No. 1031866)
brett@dereksmithlaw.com
Caroline H. Miller, Esq. (Fla. Bar No. 1012331)
caroline@dereksmithlaw.com
**DEREK SMITH LAW GROUP, PLLC**
701 Brickell Ave., Suite 1310
Miami, Florida 33131
Telephone: (305) 946-1884
Facsimile: (305) 503-6741
*Attorneys for Plaintiffs Ruben Guzman, Yonder Sanchez, and Emmanuel Duchatellier*